# REPORTS OF CASES

## DETERMINED IN THE

# SUPREME COURT

### OF THE

# STATE OF NEVADA,

## APRIL TERM, 1868.

---

THE STATE OF NEVADA, APPELLANT, *v.* THE YELLOW JACKET SILVER MINING COMPANY, RESPONDENT.

APPEAL ON GROUND OF VERDICT AGAINST EVIDENCE—CONFLICT OF TESTIMONY. An Appellate Court will not disturb the verdict of a jury upon the ground that it is not supported by the evidence, if there is a material conflict in the evidence and there is some substantial testimony to support it.

WHEN A VERDICT WILL BE REVERSED AS AGAINST EVIDENCE. To justify an Appellate Court in reversing the verdict of a jury on the ground that it is against evidence, there must be a preponderance of evidence against it so great as to satisfy the Court that there was either an absolute mistake on the part of the jury, or that they acted under the influence of prejudice, passion, or corruption.

DISTINCTION AS TO WEIGHT OF EVIDENCE ON NEW TRIAL AND ON APPEAL. The rule that a verdict should not be reversed as against evidence by an Appellate Court, where there is a material conflict in the testimony, and there is some substantial evidence to support it, does not apply with strictness to motions for new trial; and it is generally held that on such motions, to authorize the *nisi prius* Judge to set aside a verdict, the weight of evidence against the verdict need not be so decided and great as is required by an Appellate Court to reverse it.

TRIAL BY COURT—FINDINGS EQUIVALENT TO VERDICT. Where a cause is tried by a Court without a jury the same weight and consideration is given to its find-

ings as to a verdict; and the same rules apply as to reversing them on appeal on the ground of being contrary to evidence, as to a verdict of a jury.

TIME OF PUBLICATION—"ONCE A WEEK FOR THREE WEEKS." Where a statute for the maintenance of public schools (Stats. 1864–5, 413, Sec. 35) provided that to impose an additional school tax, an election should be called by posting notices for twenty days, and "if there is a newspaper in the county, by advertisement therein once a week for three weeks": *Held*, that it was not necessary for the call to be published twenty-one days before the day of election, but that three insertions upon three successive weeks and at any time in any of such weeks before the election, were sufficient.

APPEAL from the District Court of the Second Judicial District, Ormsby County.

This cause was decided at the April Term, 1868, but not ready for publication in 4th Nevada Reports. As will be seen there was a difference of opinion in the bench, the views of Lewis, J. in respect to one branch of the case being concurred in by the then Chief Justice Beatty, and in respect to the other branch of the case, by Johnson, J.

The whole amount of the tax for which suit was brought, was five hundred and eighty-five dollars and nine cents. There was judgment for defendant, from which and from an order denying plaintiff's motion for a new trial, this appeal was taken.

*Samuel C. Denson*, for Appellant.

I. The assessment-roll was introduced as evidence of the delinquency, the property assessed, amount of delinquency, and that all the forms of law in relation to the levy and assessment of the tax had been complied with ; and such evidence established *prima facie* every fact to entitle the plaintiff to recover. (Stats. 1864–5, 287, Secs. 34 and 36.) The plaintiff was therefore entitled to a recovery, unless the defendant's evidence was so direct and strong as to overthrow or outweigh plaintiff's *prima facie* case. An Appellate Court should reverse a judgment against the weight of evidence unless the equities of the case are with the verdict. (Graham & Waterman on New Trials, 362 and 367.)

II. The testimony of Jones shows the existence of better evi-

dence of the time of posting the notices. He says Bence posted them. If the defendant believed the notices were not posted in time, Bence should have been called as a witness. Where it appears that all the evidence was not before the Court on the trial, the Appellate Court will order a new trial in order that complete justice may be done. (1 Graham & Waterman on New Trials, 374.)

III.   Publication in a newspaper every day from the nineteenth of July until the fifth of August, is more than ample as a publication " once a week for three successive weeks." (*Bachelor* v. *Bachelor*, 1 Mass. 253 ; *Sheldon* v. *Wright*, 5 N. Y., 1 Seld, 517 ; *Olcott* v. *Robinson*, 21 N. Y. 150 ; 9 Curt. 94).

*Robert M. Clarke*, for Respondent.

I.   There being some evidence to support the findings, and the motion for a new trial having been denied, this Court will not reverse the order. (16 Cal. 76 ; 17 Cal. 92 ; 24 Cal. 338 ; 25 Cal. 437 ; 32 Cal. 332 and 530.)

II.   But the findings are not impeached by any testimony in the record. Jones testifies that the notices were prepared July 15th, 1867, and posted by Bence some time after they were prepared— not on same day ; and that copy was handed to editor *Appeal* on evening of said day, or day after notice was posted by Bence. Robinson testifies that notice was published first time July 19th, and thinks it was handed in for publication on the eighteenth. From this proof it clearly appears that the notices were neither posted twenty days, nor published three weeks. Under this proof, the notice could not have been posted earlier than July 17th, 1867, and as the election was held August 5th, 1867, only nineteen days' notice was given by posting, and seventeen by publication, including the day of election.

III.   The Board of Trustees in calling election for special school tax, are required to give twenty days notice, by posting notices, and by publication for three weeks in county paper. Having failed

to comply with this section of the law, the election was irregular, and the tax imposed illegal and void. (1 Denio, 9; *Bunce* v. *Reed*, 16 Barbour, 347; *Olcott* v. *Robinson*, 21 N. Y. 155; Opinions of Comstock, C. J.; *Sheldon* v. *Wright*, 7 Barbour, 39.)

. By the Court, LEWIS, C. J.:

The appellant seeks a reversal of the judgment in this case, upon the sole ground that the findings of fact by the Court below were not warranted or supported by the evidence. But as the evidence is conflicting, it is claimed on behalf of the respondent that this Court should not set aside the findings, or reverse the judgment—and thus the question as to what state of proof will authorize an Appellate Court to set aside a verdict, when no objection is made to it except that it is not supported by the evidence, is directly presented. It must be admitted that there is an endless difference of opinion, among the members of the profession, upon this question; but it appears to me the rule is well established by the authorities, and maintained upon principle, that an Appellate Court will not disturb the verdict upon the ground here taken, if there is a material conflict in the evidence, and there is some substantial testimony to support it.

This rule is certainly recommended by obvious and cogent reasons. Under our laws it is the peculiar province of the jury to weigh the evidence, to judge of the credibility of witnesses, and to decide upon which side the testimony preponderates. It is their duty, and they are sworn, to render such verdict as the evidence may justify. It must be presumed that they conscientiously do their duty, and that they are competent to do it understandingly. The verdict, therefore, when rendered, is the conscientious conclusion arrived at by twelve competent men, who have heard the evidence and seen the witnesses. It must also be borne in mind, that they have the opportunity of closely observing the manner in which each witness testifies; his appearance on the stand; his emphasis and the inflection of voice, which often give a significance and meaning to words and sentences not apparent to those who only read the evidence as it is usually taken down. The Appellate Court sees nothing of the witnesses, but is compelled to rely solely

upon the imperfect and meager synopsis of the testimony which is taken at the trial, or written down afterwards from recollection. Thus, it does not possess the means which the jury do, of determining what weight is to be given to the evidence of any particular witness, or of ascertaining with certainty what it may have been his real desire to say.

The advantages thus possessed by the jurors should entitle their deliberate conclusion, as to the preponderance of evidence, to very great consideration from an Appellate Court possessing none of these advantages. The rule seems, therefore, to be founded upon substantial reasons; and in my opinion is supported by the authorities. It will also be observed, from the cases which I shall refer to, that the old rule has not been changed by the new practice of allowing an appeal from an order granting or refusing a new trial. After an elaborate review of the authorities, Mr. Waterman, in 3 Graham & Waterman on New Trials, 1213, states his views of this question in the following manner:

"It has been a debated and vexed question as to whether, after the Court that tried the cause has decided that the verdict must stand, an Appellate Court can, notwithstanding, order a new trial. The presiding Judge has heard—and what is still more important—has seen the witnesses testify; noticed their demeanor; listened to their cross examination. Minute circumstances, which are often the turning point in a case, have not escaped him. The evidence has been presented full and fresh to his mind—after having passed through the slow and severe ordeal of judicial scrutiny. He has had the benefit of the siftings of counsel. On the other hand, the Appellate Court has enjoyed none of these advantages. It receives the testimony on paper; and thus presented, it is always tame, meager, and unsatisfactory. Its whole knowledge being thus derived, it is but illy qualified to pass an enlightened judgment upon it. The reasons, therefore, for denying to the Appellate Court the right to reverse the decision of the Judge who tried the cause, confirming the verdict, possesses great weight. It is certain, that this right should never be exercised except in extreme cases."

The force of the reasons thus stated by the author is fully recognized by the Courts, and the uniform current of authorities seems

to justify the observation that the "right should never be exercised except in extreme cases." In *Cohen* v. *Dupont*, (1 Sandford, 262) the Court states the rule in this manner : " Where there is testimony on either side sufficient to warrant a verdict if standing alone, we are not at liberty to overturn the verdict for the reason that there was counter testimony on the other side, even if it be apparently equal in point of weight. *There must be a preponderance of evidence against the finding of the jury so great as to satisfy us that there was either an absolute mistake on their part, or that they acted under the influence of prejudice, passion, or corruption.* (See also *Mann* v. *Witbeck*, 17 Barb. 388 ; 5 Sandford, 180 ; 1 Whittaker's Practice, 745.) In Kentucky the rule is thus stated by the Court of Appeals in the case of *Maxwell* v. *McIlvoy* (2 Bibb, 211) : " What verdict we would have given if we had been on the jury is not the question for our discussion. The circumstances and evidence in relation to the facts of loss and injury to the plaintiff, and of the negligence of the defendant, belonged peculiarly to the jury to weigh and determine upon. If their verdict were clearly contrary to the evidence it was the duty of the Court before whom the cause was tried to have granted a new trial, and if that Court improperly refuses to do so, and the error was manifest to us, we should feel it our duty to reverse the judgment and direct a new trial. But this power ought to be exercised by the Court with extreme caution, when we consider the great difficulty, and indeed the impossibility, of bringing the question before us upon paper as it may have appeared before the Court and jury who tried it below. It is true this case does not present the same latitude for misconception and adverse understanding of the evidence as those in which the credibility of witnesses, their pronunciation, etc., are all important to the decision. This consideration furnishes additional weight in favor of the application to this Court, yet we hold that in order to justify this Court in reversing and ordering a new trial upon the ground that the verdict is contrary to the evidence, the evidence and verdict ought to appear clear, in an unquestionable light, and without doubt, when carefully examined and compared together, as repugnant and opposed, the one *obviously* not supporting or warranting the order."

The rule thus enunciated has been uniformly followed by the Court of Appeals in Kentucky, and repeated with more or less force in nearly all the cases in which the question has been presented. (See also A. K. Marshall, 58 and 29.)

In Tennessee the Court of Errors has held that it will not reverse the verdict of an inferior Court if there be any proof by which the verdict can be sustained. (*Dodge* v. *Brittain*, 1 Meigs, 84 ; *Sellars* v. *Davis*, 4 Yerger, 503.) So in Georgia, the Supreme Court, in the case of *Hall* v. *Page*, (4 Geo. 428) reiterates the rule in this emphatic language : " We have, in several instances, said that we would interfere only in extreme cases—in cases that are strong and unequivocal, or of gross injustice, or where there was no evidence, or the verdict was palpably contrary to the evidence."

In those States where an appeal is allowed from an order refusing a new trial, the same rule is strictly followed and just as strongly stated. (*Lockwood* v. *Stewart*, 12 Wis. 628 ; *Laville* v. *Lucas*, 13 Wis. 617 ; *Lewellen* v. *Williams et als.*, 14 Wis. 687 ; *Cook* v. *Helms*, 5 Wis. 107 ; *Barnes* v. *Merrick*, 6 Wis. 57 ; 11 Minn. 296 ; *Whitney* v. *Blunt*, 15 Iowa, 283 ; *Brockmam* v. *Berryhill*, 16 Iowa, 183 ; *Kile* v. *Tubbs*, 32 Cal. 332 and 530 ; *Lubeck* v. *Bullock*, 24 Cal. 338.)

The evidence on behalf of the defendant, although weak and very unsatisfactory, still seems to be sufficient to bring this cause within the rule. The evidence offered by the defendant does not seem to warrant the findings, but I cannot say that there is such a great preponderance on the other side as to justify an Appellate Court in setting them aside. The plaintiffs' case was made out by a presumption of law, not by any means very strong, and the testimony for the defendant was about as unsatisfactory as it could be. However, under the rule which must govern this case, it is sufficient to sustain the findings. Some of the reasons given for supporting the verdict of a jury may not be pertinent, when the trial was without a jury and the facts are found by the Judge. The rule, however, is general, and the same weight and consideration is always given to such findings as to a verdict. It must be borne in mind that this rule should not govern the lower Courts. The Judge who tries

the cause, like the jury, hears all the evidence and sees the wit-
nesses ; it is, therefore, very generally held that the weight of evi-
dence against the verdict need not be so decided and great to
authorize the *nisi prius* Judge to set aside a verdict as is required
by the Appellate Courts.    The Judge who tried the cause should
not hesitate to set aside a verdict where there is a clear preponder-
ance of evidence against it.

The conclusion at which I have arrived upon this point disposes
of this case ; but there is another point made against the validity of
the tax which will probably be raised in other cases growing out of
this assessment and levy.    Hence, it is expedient to pass upon it
at the present time, and thus remove the question from consider-
ation in other cases not disposed of, or which may hereafter be
brought.    This second point made by counsel for defendant is, that
the notice which the law requires to be published " once a week for
three weeks " was advertised only for seventeen days, which, it is
argued, was not a compliance with the requirements of the law.
The language of the statute, it is claimed, makes it necessary that
the first publication should be twenty-one days prior to the election.
But, in my opinion, the statute admits of no such construction.
The purpose of the advertisement is to give notice to the legal
voters of the school district.    When there have been three inser-
tions of such notice upon three successive weeks the object of the
publication, so far as it can be, is accomplished.    The statute cer-
tainly requires but three publications of ·the notice ; why then is
not its full purpose accomplished upon the expiration of the third
day of publication.    Some statutes require a publication for a
definite period of time, or a certain number of days, and in such
case of course the advertisement must be for the full period, but
where it is required to be published once a week for a certain num-
ber of weeks, it is generally held that the number of insertions and
not the days comprised in such weeks is to be regarded.    Thus, in
the case of *Bachelor* v. *Bachelor*, (1 Mass. 256) it was held that
" an order to give notice by publishing in a newspaper three weeks
successively " was complied with by publishing in such paper in
three successive weeks.    In that case, the paper being issued twice
a week, only twelve days elapsed between the first and last adver-

tisement; but as there was one advertisement on three successive weeks, the Court held it sufficient. So it has been held by the New York Court of Appeals upon a statute similar to ours. (*Sheldon* v. *Wright*, 5 N. Y. 497; *Olcott* v. *Robinson*, 21 N. Y. 150.) The publication was therefore sufficient.

Judgment affirmed.

By JOHNSON, J.:

Section thirty-five of "An Act to provide for the Maintenance and Supervision of Public Schools," approved March 20th, 1865, provides as follows: "The Board of Trustees of any school district may, when in their judgment it is advisable, call an election, and submit to the qualified electors of the district the question whether a tax shall be raised to furnish additional school facilities for said district, or to keep any school or schools in such district open for a longer period than the ordinary funds will allow, or for building an additional school house or houses, or for any two or all of these purposes. Such election shall be called by posting notices in three of the most public places in the district for twenty days, and also if there is a newspaper in the county, by advertisement therein once a week, for three weeks. Said notices shall contain the time and place of holding the election, the amount of money proposed to be raised, and the purpose or purposes for which it is intended to be used. The Board of Trustees shall appoint three Judges to conduct the election, and it shall be held in all other respects as nearly as practicable in conformity with the general election law. At such election the ballots shall contain the words: "Tax, Yes," or "Tax, No," and also the name of one person as Assessor, and one as Collector: *provided, however,* the same person may be elected to both offices. If a majority of the votes cast are "Tax, Yes," the officers of the election shall certify the fact to the Board of Trustees, and shall also certify the names of the person or persons having the plurality of votes for Assessor or Collector. The Board of Trustees shall issue certificates of election, and the Assessor shall, on receiving his, forthwith ascertain and enroll, in the manner provided for County Assessors, all the taxable persons and property in the dis-

trict, and within thirty days he shall return his roll footed up to the Board of Trustees. The Board of Trustees, upon receiving the roll, shall deduct fifteen per cent. therefrom for anticipated delinquencies, and then, by dividing the sum voted, together with the estimated cost of assessing and collecting added thereto, by the remainder of the roll, ascertain the rate per cent. required ; and the rate so ascertained shall be, and it is hereby levied and assessed to, on or against the persons or property named or described in said roll, and it shall be a lien on all such property until the tax is paid ; and said tax, if not paid within the time limited in the next succeeding section for its payment, shall be recovered by suit, in the same manner and with the same costs as delinquent State and county taxes."

Under this authority an election was called in District No. 2, Ormsby County, for Monday, the fifth of August, 1867, to vote on the question of levying a tax for the purpose of building a school house in said district, and upon the proceedings had it is claimed that defendant became liable to pay the amount of tax assessed upon its property ; and to enforce its payment suit was brought in the District Court. The answer of defendant presents but one ground of defense which is necessary to be considered here— whether the time of posting and advertising such notices was sufficient under the section of the law above quoted. The cause was tried by the Court without a jury, and the findings and judgment were for defendant; and a new trial being denied, this appeal is taken from both the order and judgment.

There is no controversy as to the facts concerning the newspaper advertisement, but it is conceded that the notice calling such election for Monday, the fifth of August, 1867, was published in a newspaper of said county for the first time on Friday, the nineteenth of July, and continued almost daily in each issue of the paper up to and including Sunday, the fourth of August, the day preceding the election. That it was not published on the day of such election, the fifth of August, as no paper was issued on that day. Upon these facts, the Court held that the newspaper publication was insufficient in point of time. This brings up the main question in the case, for it is conceded that if the notice was not

published for the requisite length of time, the election held in pursuance thereof was void, and the assessment made is also void and cannot be enforced.

The statute authorizes an election for the purposes stated, upon certain conditions, by posting notices in three public places of the district for twenty days, and also if there is a newspaper in the county, by advertising therein once a week for three weeks. This is the language of the statute, and adopting the line of argument and mainly the language of Chief Justice Comstock, in *Olcott* v. *Robinson*, (21 N. Y., 156) its plain meaning is that three whole weeks must elapse between the commencement of the advertisement and the day of the election. If we abridge the time for a single day, we may do it for as many days as we please, and the statute becomes a dead letter. This advertisement must be made by posting the notice of the election in the manner pointed out by the statute, and by causing a copy to be printed " once a week for three weeks " in a newspaper of the county, if there be one published therein. Two things, therefore, are required to make the advertisement complete : one, the posting the notice ; the other, its insertion in a newspaper ; and the publication in both its branches must be for the respective periods before such election. There is no publication at all unless the notice is both posted and printed in a newspaper ; and if we say that the time of either may be shortened, we hold in substance that an advertisement for any time less than the prescribed time is sufficient. This we cannot do without abrogating the statute. These views, although expressed by a minority of the Court, present the question correctly and forcibly, and as I will show are abundantly supported by the decisions of other Courts of high authority. Some of the cases bearing on this point I will notice.

In 1 Wend. (anon.) 90, the affidavit set out that the notice had been regularly published in the newspaper directed, once in each week for six weeks successively, commencing on a certain day. It was held insufficient in not showing that it had been published for the full term of six weeks successively—that is, for forty-two days. A similar rule prevailed in *Bunce* v. *Reed*, (16 Barb. 347). See also, *Ronkendorff* v. *Taylor's Lessee*, (4 Pet. 349). The Supreme

Court of the United States (*Early* v. *Doe*, 16 Howard, S. C. R. 610) held that notice of a tax sale once in each week for twelve successive weeks is not given, unless the first notice preceded the sale eighty-four days. This case seems to be more directly in point than any I can find. "The preposition *for*," says the Court, "means of itself duration when it is put in connection with time, and as all of us use it in that way in our every-day conversation, it cannot be presumed that the Legislature, in making this statute, did not mean to use it in the same way. Twelve successive weeks is as definite a designation of time, according to our division of it, as can be made. When we say that anything may be done in twelve weeks, or that it shall not be done for twelve weeks after the happening of a fact which is to precede it, we mean that it may be done in twelve weeks or eighty-four days, or, as the case may be, that it shall not be done before. The notice for sale, in this instance, was the fact which was to precede the time for sale, and that is neither qualified nor in any way lessened by the words " once a week," which precede in this statute those which follow them, " for at least twelve successive weeks."

The Supreme Court of California, in a recent case construe like words of a statute in the same way, and in commenting on a number of reported cases where the question was made, the Judges take care to confine their decisions to the point that the full term required by statute must intervene between the first publication of notice and the day appointed for the performance of the act designated in the notice. (*Savings and Loan Society* v. *Thompson*, 32 Cal. 347.)

Appellant's counsel refers us to some authorities which are claimed to be the other way. In the first of these, *Bachelor* v. *Bachelor*, (1 Mass. 256) the order was directed to be published " three weeks successively," and all that the Court decided was, that a week need not intervene between each publication. The time fixed for showing cause does not appear from the report, and hence it is not shown whether the first publication was three weeks more or less before the time for showing cause. But aside from this, the order was expressed in different terms from those employed in the act we are considering, and we have no reason to suppose

that the Massachusetts Court would have differed with the Federal Supreme Court, if the circumstances had been alike.

An examination of another case cited by counsel, (*Sheldon* v. *Wright*, 1 Seld., 5 N. Y., 497) shows that no such point as the one before us was decided, and the observations of the Judge who pronounced the opinion favorable to such a construction of the statute as contended for by appellant, were followed by a disclaimer of such ground of decision. (21 N. Y. 157.) However, the question was passed on in a later case, (*Olcott* v. *Robinson*, 21 N. Y. 150) and the majority of the Court, five of the eight Judges, gave indorsement to the error of Judge Foote in the case of *Sheldon* v. *Wright*, (*supra*) in treating the case of *Bachelor* v. *Bachelor* as in point; and upon that idea, overruled the *anonymous* case in 1 Wend.; whereas, it is shown as a matter of fact no such question was made or considered in the Massachusetts case, nor indeed can I understand how the point could possibly arise upon the phraseology of the order then in question. Therefore, but trifling value can be given to either of the cases relied on as authority for appellant, and especially in the face of the more thoroughly considered adverse opinions in the cases herein cited from the decisions of the Supreme Courts of the United States and of California.

The Court below in its computation of time excluded the first day of the publication and posting of the notices, and included the day of election. This I think was proper, although the authorities are by no means uniform regarding the question. In the case of *Early* v. *Doe*, (*supra*) it appears that the learned Justice (Nelson) took a different view of it, and included both the first and last days, whilst other instances are found where the first day is included and the last excluded. In some States the matter is regulated by statute, but here we have no general act on the subject. Section four hundred and ninety-three of the Civil Practice Act provides that "the time within which an act is to be done, as provided in this Act, shall be computed by excluding the first day and including the last. If the last day be Sunday, it shall be excluded." This section only applies, as will be seen, to the computation of time, "within which an act is to be done," under the particular statute, therefore it does not apply to the case in hand. But the

rule stated, independent of statute, seems to prevail at this day in both English and American Courts, and perhaps it is correct to say in this State it has been unquestioned, wherefore it had better be followed, as it is not so important to the public how the rule is settled, as that it be settled.

This rule of construction pertains directly to the Act under consideration, but should also extend to other statutes falling within the reason and spirit of the rule. Governed by the rule thus stated it follows, the election being held on the fifth of August, that the first newspaper publication should have been not later than Monday the fifteenth of July, and the notice posted on or before Tuesday the sixteenth of July.

The findings of the Court, in respect to the next point, as to the posting of notices, should not be disturbed. The only proof introduced by plaintiff was the assessment roll. Authority to assess and collect a tax for the purposes stated is derived from the statute itself, and depends on precedent acts and conditions. The election must be called by the Board of Trustees; notice must be posted, and under the circumstances of the case be published in a newspaper for the time specified; the election to be held, and a majority of the votes cast to be in favor of the tax; all of which should be shown in the complaint, and if controverted be established by competent proof, of which the assessment roll constitutes no part. Appellant's counsel—no point being made on the pleadings—insists that the assessment roll allowed as evidence under defendant's exceptions was sufficient to establish his case in the first instance. I do not so understand the law. It makes the assessment roll "*prima facie* evidence   *   *   *   *   to prove the assessment, property assessed—the delinquency—amount of tax due and unpaid, and that all the forms of law in relation to the assessment and levy   *   *   *   *   have been complied with." (Stats. 1865, 423, Sec. 36; Stats. 1865, 267, Sec. 34.)

The assessment roll contains nothing except the names of the tax payers, description of property, value of property, and amount of tax. The "forms of law" referred to have no reference to the acts which must necessarily precede and upon which the assessment is founded in cases like this. The evidence in the case tending to

disprove the posting of notices coming from defendant was wholly unnecessary, but when before the Court was proper to be considered. The especial features of this proof need not be examined in detail. The evidence of both the witnesses on this point, although not expressed in positive, unqualified terms as to the dates of particular transactions, yet such evidence is given as their best recollection, and qualified only to that degree usually exhibited by reliable and conscientious men when testifying in such matters and having no certain or reliable data to fix the memory definitely upon the time. If either or both the witnesses could possibly be mistaken, any doubt as to their remembrance is not enhanced by the circumstance of plaintiff failing to call Mr. Bence as a witness on the point of time when such notices were posted, he being shown to be the one who did this service.

I have no doubt that the evidence warranted the findings of the Court on this point. The appellant attacks the findings, and upon it devolved the necessity of showing error, which in my judgment has not been done; wherefore, upon principle governing in such cases, this Court should not interfere.

No question was made on appeal—in fact, the point was expressly waived—as to whether an action can properly be brought in the name of the State for the purpose of enforcing the collection of a special school tax; and therefore the circumstance of the Court having consented to hear the case brought in this way must not be accepted as a determination of such question by the Court.

I appreciate the beneficial purposes for which this tax was intended, and would not allow my judgment, were the question one merely of technical or immaterial moment, to thwart the wishes of the people of the district as expressed in their election. But this is not such a case. The tax can be imposed on the property of the citizen only in the way and manner the law has appointed, and among the most important conditions are that the tax shall be imposed by means of a majority vote of the district. This election is authorized on the fundamental condition that the people of the district and property owners shall be notified thereof in recognition of the familiar maxim of the law: "That notice is of the essence of things required to be done." The mode and manner of imparting such notice is clearly

pointed out in the Act, and when the agents of the law have so far misunderstood their duty as to omit giving notice as prescribed, and the tax for such reason is refused, the Courts are powerless to remedy the mischief.

The judgment and order of the District Court should be affirmed.

By BEATTY, C. J.:

Two points arise in this case : one as to a pure matter of law ; the other, rather as to a question of fact. The first question is, whether a law which requires an advertisement of an election to be inserted in a newspaper " once a week for three weeks," can be complied with without having the first insertion in the paper twenty-one days before the proposed election. Upon this subject there is a difference of opinion between my associates ; and as the question is one of some interest, and on which there is some little confusion of authorities, I propose to give my separate views. The word " week," both in laws and in common conversation or writing, has two separate and distinct meanings. Sometimes, week means a period of time commencing on Sunday morning and ending Saturday night at midnight: at other times we use the term as signifying a period of time of seven days' duration, without any reference to when that time commences, whether on Sunday, Monday, or Saturday. For want of a better mode of distinguishing these two kinds of weeks, I shall call that week which commences with Sunday and ends with Saturday a biblical week ; the other I shall in this opinion call a secular week.

A few examples will show with what distinct meanings the word is used. If a party should on Thursday of any week contract to do a certain thing before the end of *this week,* no Court would hesitate to say it must be done before midnight of the following Saturday, or within two days and a fraction—the language having reference to a biblical week. But if the party contracted to do the same thing within *a* week, then he would have full seven days within which to accomplish it. In the latter contract, week would simply mean a period of seven days. If a law required a certain thing to be advertised " one day in each of three successive weeks," the most stupid person could hardly fail to see that biblical weeks

were meant; and that an advertisement inserted, say, on Saturday the first, Monday the third, and Monday the tenth, of a certain month, would be a full compliance with the law; that the advertisement was completed on the expiration of the tenth day of the month. On the other hand, if the law required a thing to be advertised "for the full period of three weeks by not less than one insertion weekly in a newspaper," "week" in the first clause of the sentence would according to all the cases mean a period of seven days, and have no reference to the biblical week. Under such a law the full period of twenty-one days would have to elapse after the first advertisement before the law would be complied with. But there would be no necessity for the passage of three complete biblical *weeks* to make the advertisement complete. To illustrate: The first notice might be inserted Thursday the first, of a given month; the second, Thursday the eighth; and the third, Thursday the fifteenth—the three weeks would expire Wednesday the twenty-first; and any sale that was to be preceded by the three weeks' advertisement could take place on Thursday the twenty-second of the month. From Thursday the first to Sunday the fourth would only be the fraction of a biblical week. The first full biblical week would commence with Sunday the fourth, and end with Saturday the tenth; the second would commence Sunday the eleventh, and end with Saturday the eighteenth. Then, there would be another fraction of a biblical week between that and the twenty-second.

I have thus attempted to illustrate the different meanings which we are compelled to attach to the word "week," in laws regarding periods of time for advertising. If we could in reading any law say, whether "week" meant a biblical week, or simply a period of seven days, we would generally be past the greatest difficulty in interpreting such law. But unfortunately, this point is frequently a very difficult one; and even after this preliminary question is settled, it does not always relieve a case of this kind of doubt. The phrase "once a week," in the law under discussion, in my opinion has reference to a biblical week; and the phrase "for three weeks," in the connection in which it stands, is only equivalent to "for three insertions," or taking them both together for one day in each of three biblical weeks. This interpretation I will

endeavor to show is supported by many authorities, and controverted by not one that I have been able to find. As the authorities on this subject have been much more fully collated by Mr. Justice Johnson in his opinion than in the briefs, I will notice the different cases to which he refers. The first case is that of *Olcott* v. *Robinson*. This was a case heard in the Court of Appeals of New York, consisting of eight Judges. Two opinions were written— five concurring in the majority opinion, and three in the dissenting opinion. It is not denied that the majority of the Court sustain the views I have expressed: but it is contended the minority opinion is adverse to these views; and that this opinion is supported by better reason and numerous authority. The New York law on which that Court was deciding, was in these words: " Shall be publicly advertised previously for six weeks successively, as follows: 1st. A written or printed notice thereof shall be fastened up in three public places in the town where such real estate shall be sold. 2d. A copy of such notice shall be printed once in each week in a newspaper of such county, if there be one."

This section of the law, it will be observed, is divided into three distinct clauses. The first clause clearly has reference to the length of time the advertisement must be continued. All the Judges seem to agree (and from the reading of the first clause of the law there was no room for doubt on this point) that the advertisement therein spoken of, must last for full forty-two days before the sale. But the majority of the Court hold that the advertisement called for in the first clause of the section was complied with by posting the notices in three public places; that the third clause of the section quoted, which has reference to the printing, must be interpreted by itself; and that clause, standing alone, does not require that the first insertion should have been six secular weeks, or forty-two days before the sale. It is sufficient if there were six insertions—each one of which was in a different biblical week, and the last one at least the day before the sale—although between the first insertion and the day of sale there may have been only five weeks and a fraction.

The opinion of the minority of the Court, delivered by Chief Justice Comstock, is to the effect that the advertisement spoken of

in the first clause is not completed by the posting of the notices: but that it takes two things—the posting and the printing; that the first and third clauses are so inseparably connected that the advertisement—which is required to be of a certain duration, to wit: forty-two days, or six secular weeks—cannot be made effectual unless that period shall have elapsed between the printing of the first notice and the day of sale. The Chief Justice does not controvert the proposition that the majority opinion is correct as to the interpretation of the third clause if it stand alone. Here, then, is clearly the opinion of five Judges of the Court of Appeals that the third clause of the New York law, referred to, should be interpreted as I interpret the clause in our law. The words in our law, and those in the third clause of the New York law, are not identical, but very similar. The dissenting opinion does not controvert this particular point, and therefore has no bearing on this case.

The next case cited by Mr. Justice Johnson, as supporting the proposition that the first insertion in the newspaper must have been at least twenty-one days before the election, is a case in 1 Wendell, page 90. In that case, the Court held that when the law required a notice to be published " six weeks successively," it meant that it should be published forty-two days. I have no quarrel with that decision. I am rather inclined to think it right. The word " weeks " there was probably meant to be used in its secular rather than its biblical sense; but that has very little bearing on this case. The phraseology there is entirely different from that used in our law. There is certainly not near so close a resemblance between the language of that law and our law, as between the expressions " six square miles," and " six miles square " ; yet every school boy knows the former expression is equivalent to six sections of land, or three thousand, eight hundred and forty acres; the latter, thirty-six sections, or twenty-three thousand and forty acres. But even if this case in 1 Wendell is at all in conflict (which I do not admit) with the views I have expressed, it is opposed to the case of *Bachelor* v. *Bachelor*, (1 Mass. 256) where the Court held that " three successive weeks " does not mean twenty-one days, or what would be, as the term is used in this opinion, three secular weeks; but that the law was fully satisfied by one insertion Saturday, June

thirtieth; one Saturday, July seventh; and the third Wednesday, July eleventh. The Court, in this latter case, hold that such a law is fully satisfied by three insertions in a newspaper, if each of these insertions be in successive biblical weeks; in other words, the whole time between the first and last insertion need not exceed ten days.

In the case in 16 Barbour, page 347, the law under which the advertisement was to be made is not given. But the counsel on both sides concede that the law requires a publication of eighty-four days, or twelve full secular weeks; there was no question on that point. The question was whether a certain affidavit showed that the notice of sale had been published for twelve full weeks. The Court held it did not show such fact. This case has no bearing on any point in the case before us.

The case of *Ronkendorf* v. *Taylor* (4 Pet. 349) is direct in point to establish one proposition for which I contend, and which is the key to the whole case before this Court; that is, that the phrase, " once a week," in all laws similar to the one under discussion, means *once in each biblical week*, and not every seventh day. Upon this point this discussion is clear and explicit; there is not a decision to be found anywhere, that I am aware of, which controverts this proposition. This interpretation is so entirely in accordance with the common usage of that term, that I doubt if this decision will ever be questioned by any respectable tribunal. As this is the important point in this case I make the following quotation from 4 Peters, to show that it is clearly and unequivocally settled:

" By the tenth section of the Act of Congress which directs this proceeding, the Collector is required to give public notice of the time and place of sale, by advertising once a week in some newspaper printed in the City of Washington, for three months, when the property is assessed to a person who resides within the United States, but without the District of Columbia. Notice of the sale of the lot in controversy was given by the Collector; first, in a newspaper published the sixth of December, 1822; the last, in the same paper of the tenth of March, 1823. These periods embrace the time the advertisement is required to be published; but it is contended that the notice was not published once in each week, within

the meaning of the Act of Congress. In examining the dates of the publications, it appears that eleven days at one time transpired between them, and at another time ten days, at another eight.

" These omissions, it is contended, are fatal; that the publication being once made, it was essential to the validity of the notice that it should be published every seventh day thereafter. The words of the law are " once a week." Does this limit the publication to a particular day of the week? If the notice be published on Monday, is it fatal to omit the publication until Tuesday the week succeeding? The object of the notice is as well answered by such a publication, as if it had been made on the following Monday.

" A week is a definite period of time, commencing on Sunday and ending on Saturday. By this construction, the notice in this case must be held sufficient. It was published Monday, January the sixth, and omitted until Saturday, January the eighteenth, leaving an interval of eleven days; still, the publication on Saturday was within the week succeeding the notice of the sixth. It would be a most rigid construction of the Act of Congress, justified neither by its spirit nor its language, to say that this notice must be published on any particular day of a week. If published once a week, for three months, the law is complied with and its object effectuated." Upon other points in this case this opinion has no bearing.

The next case cited by Justice Johnson is *Early* v. *Doe*, (16 How. 610) where, according to his understanding of the decision, the Court held " that notice of a tax sale once in each week for twelve successive weeks is not given unless the first notice precede the sale eighty-four days." This case he thinks is more directly in point than any case he could find. If the Court had held as he says, it would be a case in point in favor of his views. But in the case referred to there was but one written opinion delivered or reported, and that is the opinion of Mr. Justice Wayne. He holds that where the statute requires the insertion of a notice in a newspaper " once in each week for *at least* twelve successive weeks," the first insertion must be *at least* eighty-four days before the sale. But he makes the whole decision rest on the two words " at least," and admits that if those words were omitted, and the law simply

read " once in each week for twelve successive weeks," it would require an entirely different interpretation. I quote from the opinion, a few sentences in advance of the quotation made by my associate :

" We do not doubt, if the statute had been ' once in each week for twelve successive weeks,' a previous notice of the particular day of the sale having been given to the owner of the property, that it might very well be concluded that twelve notices in different successive weeks, though the last insertion of the notice for sale was on the day of sale, was sufficient. But when the legislator has used the words, " for at least twelve successive weeks," we cannot doubt that the words at least, as they would do in common parlance, mean a duration of the time that there is in twelve successive weeks, or eighty-four days."

This law, leaving out the words *at least*, is precisely similar to the law I am considering. Our law says " once *a* week," this law says once *in each* week. There is no substantial difference. Our law, in the last part of it, says " for three weeks," the other " for twelve *successive* weeks." Here there is no material difference. This law, so similar to our own, in the opinion of Justice Wayne, with the words " at least " left out, should be interpreted just as I interpret the Nevada law. Although this opinion directly sustains my views, I do not consider it of much importance, because the whole reasoning of Mr. Justice Wayne in this case is singularly confused and unsatisfactory. I only claim it is not, and cannot by any possibility, be held an authority against my views. I do not understand the words *at least* to have any such significance as is attached to them by Justice Wayne, and I do not believe that where the law requires an advertisement to be inserted in a newspaper " once a week for twelve weeks " before a sale, that the sale can take place on the day of the last insertion. If so, the sale might take place in the morning of the day of the last publication and the paper not be issued until the afternoon.

The case cited from 32 California has not the most remote bearing on this case, or any point arising therein.

To recapitulate : our statute requires an advertisement to be inserted in a newspaper " once a week for three weeks." The case

cited from 4 Peters, 349, holds clearly that " once a week " for three months means each biblical week—that is, once between each Sunday and Saturday night—and that the particular time of the week makes no difference.    The first insertion might be Monday, the first of a month, and the second Saturday, the thirteenth ; the third Monday the fifteenth, and so on to the end of the chapter.

The expression " once a week " means once in each biblical week.    " For three weeks," I admit, if standing alone, might mean either for twenty-one days or for three biblical weeks.    But connecting it with the foregoing part of the sentence, and it can mean nothing but biblical weeks.    The sentence then may be interpreted to read thus : shall be inserted in a newspaper once in each biblical week *for three weeks.*    That is, for one day of each of three biblical weeks.    To my mind, this is the true interpretation pointed out by the language of the law and sustained by all the authorities, so far as they bear on this question.    There is no connection between this part of the law and that which requires the notices to be posted.    The notices are not required to be posted for three weeks, but only for twenty days.

The other point in this case is whether the testimony supports the finding of fact by the Court in relation to the posting of notices. The Court below held very properly, in my opinion, that the introduction of the assessment roll was all the evidence that the law requires to make out a *prima facie* case for the appellant.    The burden of proof then was thrown on the defendant to show that the tax was not regularly assessed.    The Court found, as a matter of fact, that the notice of the election was not posted for twenty days prior thereto in three of the most public places in the district.

Where the law requires a notice to be posted by a public officer for a certain length of time before any act is done, it will, in the absence of proof to the contrary, presume the officer did his duty. In this case it is admitted that the proper notices were posted, that they bear date the fifteenth of July, and the posting was in time if even done on the sixteenth of July.    But it is claimed the proof shows the posting was not done until after the sixteenth of July. In my opinion, the proof does not show any such fact; it is hardly sufficient to show a suspicion that such may have been the case.

S. E. Jones, one of the School Trustees, first testifies, in substance, that he was appointed to post and have published the notices of election. His exact language in regard to that posting was as follows: " Some time after this meeting [the meeting when he was appointed or requested to give the notice] I *think* on the fifteenth of July, 1867, the day the notice bears date, Mr. Bence and myself prepared the notices; we prepared them at Empire  *  * A short time after notice was prepared—don't remember the day —Mr. Bence, who was going down the river for the purpose of assessing, at my request, took with him and, as I understood, posted the notices. The notice was not posted on the day it was prepared.  *  * I handed copy to the editor of the *Appeal* for publication myself. I think I handed copy to *Appeal* on the evening of the same day, or on the day after the notices were posted by Bence." This is all the testimony in relation to the posting of the notices, except that of Mr. Robinson, which I will notice presently.

What does this testimony amount to when analyzed? Jones helped to prepare the notices; he *thinks* they were prepared the day they were dated. This, one would naturally *suppose* or *think*, merely from the date. The testimony amounts to but this: he did not recollect that the notices were either ante-dated or post-dated. It amounts to but little more. He knows, too, that notices were not posted the day they were written. Now this is all his testimony bearing directly on this question. A reference to the calendar (and the Court may always take judicial notice of the course of time) shows that the fifteenth of July, 1867, was Monday. If the notices were written on Saturday or Sunday, knowing that they could or would not be posted on the day written, nothing would be more natural than to post-date them, as of the next Monday. Business men in preparing notices on Sunday to be used the next day almost always date them as of Monday. This circumstance does not seem to have been called to the attention of the witness, and probably was not observed at the time of the trial, either by the Court or counsel. Yet, in my mind, it is a strong circumstance tending to show the witness was mistaken in supposing the notices were dated the day they were written. But even if the notices

were written as well as dated on Monday the fifteenth, the witness only says they were not posted the day they were written. He does not pretend to say they were not posted the next day. Then this evidence of Jones, unconnected, is clearly insufficient to overcome the legal presumption in favor of the regularity of the posting.

It is claimed, however, that the testimony of Mr. Robinson, connected with that of Mr. Jones, makes a stronger case. I cannot so see it. The following is all the testimony of Mr. Robinson having the least bearing on this point: "I am one of the publishers of the Carson *Daily Appeal*; that notice [the notice for school election] was inserted in the *Appeal* the first time on the nineteenth day of July, 1867. I do not remember when it was handed in for publication, though I think it was on the eighteenth." Jones says he handed copy of notice to the *editor* of the *Appeal* himself. He *thinks* it was handed to the *Appeal* the evening of the day or the day after it was posted. The last legal day for posting was the sixteenth. If, says respondent, Robinson was right in *thinking* that the notice was handed in to the *Appeal* for publication on the eighteenth, and Jones was right in *thinking* that he handed it in to the *Appeal* the day or the day after Bence put up the notices, the posting must have been as late as the seventeenth, which was one day too late. It is claimed that this is some proof, and if there is any proof to sustain the finding it must be upheld.

In the first place, I deny that this is any proof at all. The opinions of a witness, except in a few cases, such as the opinions of experts, etc., are not legal evidence. The recollection of witnesses may be. The language used by Jones is not certainly what ought to have been used to be perfectly satisfactory. When he said, *I think* I handed copy, etc., if he meant to convey the idea that that was his recollection of the time, the testimony was competent, though the most accurate language to convey his idea was not used. Taking his whole language together this is, perhaps, the idea he meant to convey. This testimony may be entitled to its due weight, but the testimony of Mr. Robinson is quite different. He says he was "one of the publishers;" he does not say he was "the editor" of the *Appeal*. He states distinctly he does not *remember* when the notice was handed in for publication. He thinks it was the eight-

eenth.    He might have thought it was the eighteenth because some one told him so.    This would not be evidence.    His opinion, when it is shown clearly it was not based on memory or recollection, was not evidence.

But this is not the only objection to this testimony.    Even if the *opinions* of these two witnesses are to govern in such a case the connecting link between the two must be properly supplied.    Jones does not say either that he gave the notice to Robinson, to the publishers, or either of the publishers, of the *Appeal*.    He gave it to the *editor* of the *Appeal*.    Certainly Mr. Robinson does not show that he was the editor of the *Appeal*.    He only shows that he was one of the publishers.    The evidence does not show, but rather contradicts, the idea of the notice having been handed to Robinson. The editor of the *Appeal* may have kept the notice in his pocket for several days before Mr. Robinson or any of the publishers saw it.    You cannot connect the testimony of Jones and Robinson to prove anything in regard to the time of handing in the notice, without the intermediate link, to wit, the editor.    But no editor is introduced.    Neither is Mr. Bence, who posted the notices, introduced.    To my mind, then, there is an utter failure on the part of the defendant to prove what was attempted to be proved, to wit, that notices were not posted for twenty days.

Believing there is no legal evidence to support this finding, I shall not go into any minute examination of how far this Court may go in weighing the testimony upon which a verdict or finding is given.    In general terms, I will say, the Court ought not to sustain a finding of any particular fact unless there is sufficient evidence to produce a reasonable presumption of its truth in the mind of a person of ordinary intellect and capacity—especially when that fact is in opposition to a legal presumption.